

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
MAY 28 2015
CLERK, U.S. DISTRICT COURT
By _____
      Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WILLIAM J. LUCK, II,<br>    Petitioner, | §<br>§<br>§ | |
| v. | §<br>§ | 3:14-CV-1989-B<br>3:12-CR-0033-B |
| UNITED STATES OF AMERICA,<br>    Respondent. | §<br>§<br>§ | |

# FINDINGS, CONCLUSIONS AND RECOMMENDATION
# OF THE UNITED STATES MAGISTRATE JUDGE

This cause of action was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b), as implemented by an order of the United States District Court for the Northern District of Texas. The Findings, Conclusions and Recommendation of the United States Magistrate Judge follow:

## I. Procedural Background

On February 16, 2012, Petitioner pled guilty to a one-count information charging him with failure to file an IRS form 8300, in violation of 31 U.S.C. §§ 5322(a) & 5331. He was sentenced to 37 months in prison. On February 18, 2014, the Fifth Circuit Court of Appeals affirmed the conviction and sentence.

On June 2, 2014, Petitioner filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255. He argues:

1. He received ineffective assistance of counsel when counsel failed to meaningfully challenge the Government's evidence of structuring; and

2. The Government presented false and misleading testimony and evidence at the

sentencing hearing.

## II. Factual Background

The following factual background is taken from the PSR, factual resume and sentencing hearing transcripts.

Between 2003 and 2010, Petitioner owned and operated "Hydro-Expo," which was a business that sold hydroponic growing equipment. In 2007, DEA agents and IRS agents began investigating "K.K.," a large-scale marijuana grower in Northern Texas. Agents also executed a related search warrant at the home of an individual who later agreed to serve as a confidential source ("CS"). The warrant yielded hydroponic growing equipment and over 400 marijuana plants. The CS admitted that in 2007 he paid Hydro-Expo over $20,000 in cash for growing equipment, and that the CS had conversations with Petitioner and Petitioner's employees about growing hydroponic marijuana.

Under the DEA's direction, the CS contacted Petitioner in September 2009 to purchase $20,000 worth of equipment for the purpose of growing marijuana. The CS met with Petitioner and emphasized that the CS's partners did not want any records of the transaction. Petitioner agreed. On October 29, 2009, the CS and an undercover DEA agent met with Petitioner to finalize the deal. The agent and the CS told Petitioner that they only had $17,000 in cash to buy the equipment because their latest marijuana harvest fell short of expectations. Petitioner accepted the $17,000, and the agent and the CS took delivery of the equipment. The agent told Petitioner they did not want their names on any reports. Petitioner told them he did not know their names, and that he would break up the order into smaller cash sales to avoid any reports.

After the undercover cash transaction was completed, IRS Agent Byrd examined Hydro-

Expo's account records at Frost bank, where Petitioner had one of his business accounts. Byrd determined that Petitioner had structured large cash amounts into multiple smaller deposits, just as he stated to the agent and CS during the undercover operation. By structuring the deposits, Petitioner avoided the $10,000 threshold that would have triggered the bank's requirement to file a cash transaction report ("CTR").[1] Petitioner also failed to file an IRS Form 8300 for the $17,000 undercover transaction, which businesses are required to file for cash transactions of $10,000 or more. 31 U.S.C. § 5331.

Agent Byrd also reviewed the records from Petitioner's operating account at JPMorgan Chase Bank. This review showed that Petitioner had structured $437,714.93 in cash deposits between January 2008 and January 2009 to avoid filing the CTRs.

On February 16, 2012, Petitioner pled guilty to one count of failing to file IRS Form 8300 for the $17,000 undercover cash transaction. The PSR determined that Petitioner's $437,714.93 in structured deposits from January 2008 to January 2009, the structured deposits for the $17,000 undercover transaction, and the 2007 cash transaction by the CS in the amount of $20,000 should be considered relevant conduct because it showed a common scheme to avoid documentation of cash payments exceeding $10,000 in drug-related transactions. This raised Petitioner's base offense level from six to level twenty because the total value of the structured deposits exceeded $400,000. (PSR ¶ 37.) Since Petitioner knew that he was structuring money from illegal drug sales, he received another two-level increase, and because his structuring involved more than

---

[1] "Each financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000 . . . ." 31 C.F.R. § 1010.311.

$100,000 in a one-year period, he received another two-level increase. (PSR ¶¶ 38-39.) After a three-level reduction for acceptance of responsibility, Petitioner's total offense level was twenty-one. (PSR ¶ 47.) With a criminal history category of I, the guideline range was 37 to 46 months. (PSR ¶ 81.)

Defense counsel filed objections to the PSR's relevant conduct calculation based on the report of defense expert Timmie G. Millis, Sr., who was a former IRS Special Agent in the Criminal Investigation Division. Millis examined Petitioner's financial records and Agent Byrd's structuring worksheet, and wrote a report that calculated the total value of Petitioner's structuring at approximately $150,000 to $170,000. (Sent. Tr. at 9-10.) Millis used Petitioner's sales ledger to determine that Hydro-Expo only had five days of total daily cash sales exceeding $10,000.

At the sentencing hearing, Petitioner and the Government presented evidence to support their respective calculations of relevant conduct. Millis testified for the defense and explained the calculations in his report. Agent Byrd testified for the Government and the Government also submitted recordings of Petitioner made during the undercover $17,000 transaction. In the recordings, Petitioner stated he would ensure no cash reports would be filed, that he did not want to know his customer's names, and that he would break down the $17,000 cash payment into smaller deposits to prevent any cash tracing. (Sent. Tr. at 25-30.)

The Court overruled Petitioner's objections to the PSR and sentenced Petitioner to 37 months in prison.

## III. Discussion

**1.     Ineffective Assistance of Counsel**

To sustain a claim of ineffective assistance of counsel, Petitioner must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense so gravely as to deprive Petitioner of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Court stated that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Courts, therefore, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

Even if counsel is proven deficient, a petitioner must prove prejudice. To prove such prejudice, Petitioner must show "a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 694). "[T]he mere possibility of a different outcome is not sufficient to prevail on the prejudice prong." *Id.* "Rather, the defendant must demonstrate that the prejudice rendered sentencing 'fundamentally unfair or unreliable.'" *Id.* (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

Petitioner claims his counsel was ineffective when he failed to impeach Agent Byrd's inaccurate statements regarding the relevant conduct amount by showing: (1) contrary to Byrd's testimony that Petitioner did not make any deposits over $10,000, Petitioner did so on at least two occasions; (2) contrary to Byrd's testimony that Petitioner made four separate trips to the bank on January 14, 2008, Petitioner made only one trip to the bank on that date and made four simultaneous deposits; (3) contrary to Byrd's testimony that Petitioner made seven separate

deposits on April 9, 2008, Petitioner made seven simultaneous deposits on that date; (4) contrary to paragraph 26 of the PSR, Petitioner's bank records do not show that Petitioner made deposits to his JPMorgan Chase bank account on different occasions and at different bank branches on the same day; and (5) contrary to Byrd's testimony that "most of" Petitioner's deposits were between $8,000 and $9,900, only 6.5% of Petitioner's JPMorgan Chase bank deposits for 2008 were within that monetary range, and only 9.4% of those deposits identified by Byrd as evincing structuring were within that range. (Pet. Mem. at 7-8.)

### A.     Deposits over $10,000

Petitioner claims Bryd testified that Petitioner "never made any deposits over $10,000," but that the records show Petitioner did so on at least two occasions. (*Id.* at 7; Pet. Reply at 3.)

To support his claim, Petitioner relies on a report by his expert Frederick M. Bennett, who is the managing director of the forensic, investigative, and dispute services practice of the Dallas office of Grant Thornton, LLP. First, Bennett states Petitioner made a deposit on October 9, 2009, for $10,000. (Pet. Mem. Ex. B at 3-5.) This deposit, however, was made into Petitioner's Frost bank account and was not part of Petitioner's relevant conduct. (*See* Byrd's Structuring Worksheet at Pet. Mem. Ex. B at 56-62.) When Byrd testified that Petitioner did not make any deposits over $10,000 into his account, Byrd was testifying regarding his relevant conduct worksheet showing that from January 2008 to February 2009, Petitioner never made any cash deposit into his JPMorgan Chase account that was over $10,000.

Byrd testified as follows:

Q:     With respect to – first of all, what are the dates of Government's Exhibit Number 3? [Exhibit Number 3 is Byrd's relevant conduct worksheet]

> A: January 3rd, 2008, and the last entry is February 23, 2009 – excuse me, February 26, 2009, is when he closed the account.
>
> Q: And how much total did you – how much total was deposited into that account over that time?
>
> A: I don't have a total for the total amount. I have a total for the structuring amount.
>
> Q: Okay. But before we get there, did you find any deposits in his account during that time period over $10,000 at all?
>
> A: No, sir. I don't believe so.

(Sent. Tr. 31.) Therefore, any deposit made to Petitioner's Frost bank account on October 9, 2009, which was outside the relevant conduct dates and which was therefore not reflected on the structuring worksheet, does not conflict with Byrd's testimony. Further, Petitioner fails to show that this October 9, 2009, deposit was a cash deposit. He submits the first page of his October 2009 Frost bank statement to show he made a $10,000 deposit on October 9, 2009. (Pet. Mem. Ex. B at 11). The statement shows Petitioner made two deposits to his Frost account on October 9, 2009; one for $10,000 and one for $1,205.58. The statement page, however, does not indicate whether the deposit was cash, checks or some combination. Byrd testified that Petitioner never made a cash deposit over $10,000 to avoid the bank's requirement to issue a cash transaction report. (Sent. Tr. at 33-34.) He did not testify regarding the total amount, including checks, Petitioner may have deposited to his account. This claim is without merit.

The second deposit Bennett cites is a July 11, 2008, deposit for $27,000. (Pet. Mem. Ex. B at 3-4.) Bennett includes a copy of the first page of Petitioner's JPMorgan Chase bank statement, which shows a $27,000 deposit on that date, but it does not show whether this was a cash deposit. (*Id.* at 10.) Byrd's spreadsheet shows a cash deposit on that date of $9,750, plus a

deposit of three checks. (Pet. Mem. Ex. B at 59.) Petitioner has submitted no evidence that he ever made a cash deposit over $10,000 into his JPMorgan Chase account during the structuring period of January 7, 2008 to February 26, 2009, and has therefore failed to show that Byrd testified falsely. Petitioner's ineffective assistance of counsel claim is without merit.

### B.     Same Day Deposits

Petitioner claims his counsel failed to challenge Byrd's testimony that Petitioner went to the bank four times on January 14, 2008, to make four separate deposits, and that on April 9, 2008, Petitioner made seven separate deposits, which a normal businessman would not do.

The record shows Byrd testified as to how he concluded that Petitioner was structuring deposits, and what the amount of structuring was. Byrd testified that on some dates, there were multiple deposits on the same day. He stated:

> Most of the deposits, give an example for January 14, 2008, he went to the bank four different times that day and deposited $9,396.32.
>
> * * *
>
> So for these, if you look at these, he's not depositing cash every single day. It's – it's sporadic. I mean, you have – the 14th and 15th are back to back. But if you turn to April 9, 2008, you have – one, two, three, four, five, six, seven – seven deposits on the same day that do not equal $10,000; that's $8,900 that he's depositing.

(Sent. Tr. 32-33.)

> Byrd concluded that these multiple deposits were evidence of structuring. He stated:
>
> I mean, normal businessmen don't go to the bank and deposit six or seven deposits in one single day. They take it at the end of the day, and if you have over 10,000, you just deposit the amount of cash that you have.
>
> It's ironic that every single time he makes a deposit, whether it's three or four days later or the following day or the preceding day, they are never over $10,000. And with him continually asking the bank teller what the requirements are for a currency transaction

report and him failing to deposit $10,000 leads us to believe that he is structuring on purpose. This is something he's purposefully doing when he's going to the bank.

(*Id.* at 33-34.)

Petitioner argues he did not make four trips to the bank on January 14, 2008, and did not make seven separate deposits on April 9, 2008, but instead made one trip to the bank on each of these days and used multiple deposit slips, which created multiple deposits for those days. (*See* Pet. Mem. Ex. B at 3-6, 12-22.) Petitioner's defense counsel, however, made the same argument. He cross-examined Byrd as follows:

> Q: [I]t's possible that these are just different deposit slips that were filled out? You have like three deposits on January 14 on page one.
>
> A: It could be three different deposit slips.
>
> Q: Yes sir. Instead of three different slips,[2] he goes one time and has several deposit slips instead of one.

(*Id.* at 36-37.)

Byrd likewise found that using multiple deposit slips at one transaction "really wouldn't make sense." (*Id.* at 37.) He stated:

> If you are depositing in the same account, you wouldn't really make three separate bank slips. If you are depositing the same amount, you have your line items on your deposit slip, and you would put five checks and put it on the same deposit slip and turn that in to the teller with your checks and your cash.

(*Id.*)

Petitioner has failed to show his defense counsel was ineffective for failing to further challenge Byrd on this issue. Defense counsel's cross-examination of Byrd caused Byrd to admit that Petitioner could have made one trip to the bank on January 14, 2008, and one trip on April 9,

---

[2] It appears "slips" is a typo and should be "trips."

2008, and could have made the multiple deposits at the same time with separate deposit slips. Byrd's testimony was that whether Petitioner made multiple trips to the bank in the same day to make deposits, or whether he made one trip to the bank and used multiple deposits slips, this behavior did not make sense unless Petitioner was attempting to structure the deposits.

In an attempt to show the multiple deposits did not constitute structuring, Petitioner submits an affidavit from his half-brother, David Underwood. Underwood states he did consulting for Petitioner's business starting in May, 2009. Underwood states that:

> At the end of every day, Mr. Luck or an employee would balance his sales against the cash, checks and credit card receipts and bundle all of the cash and checks received from that day's sales with a daily deposit slip. A deposit slip was filled out accounting for the cash and check sales from that day. Because it was hard for Mr. Luck to leave the store he did not actually take the deposit to the bank every day. Sometimes three to five days would pass before Mr. Luck would take the daily bundles and their individual deposit slips to the bank.

(Pet. Mem. Ex. A.)

It appears Petitioner argues that defense counsel was ineffective for failing to offer this evidence during sentencing. Underwood, however, did not start consulting for Petitioner's business until May, 2009. Except for the $17,000 undercover cash purchase, the relevant conduct of structuring deposits occurred prior to May, 2009. Underwood does not claim to know Petitioner's accounting practices during this relevant time period. Further, although Underwood states a deposit slip was made each day from each day's sales, the October 29, 2009 undercover payment of $17,000 cash was not recorded for that day's sales on a single deposit slip. Instead, Petitioner structured this deposit by depositing less than $17,000 cash for that day's sales. (PSR ¶¶ 28, 31; Sent. Tr. at 33.) Petitioner has failed to establish ineffective assistance of counsel.

C.  **Different Branches on Same Day**

Petitioner claims his counsel was ineffective for failing to argue that, "[c]ontrary to paragraph 26 of the Presentence Investigation Report, Luck's bank records do not reflect that Luck made deposits into his JP Morgan Chase bank account on different occasions and at different bank branches on the same day. (Mem. at 8 and Reply at 3.)

Paragraph 26 of the PSR states:

Agent Byrd reviewed Luck's business bank records from JPMorgan Chase Account No. XXXXXX4000. From this review Agent Byrd determined, by depositing cash amounts under $10,000 on different occasions and at different bank branches on the same day, Luck had structured $437,714.93 in cash deposits beginning in January 2008 and continuing through January 2009, and again following the undercover operation, to avoid completing Currency Transaction Reports (CTRs) for deposits exceeding $10,000, as required by the Bank Secrecy Act of 1970. By way of example, Agent Byrd identified the following cash deposits as having been structured.

| Date | Deposits |
|---|---|
| January 14, 2008: | 4 separate cash deposits totaling $9,396; |
| January 15, 2008: | 4 separate cash deposits totaling $9,072; |
| March 6, 2008: | 1 cash deposit of $9,800; |
| March 7, 2008: | 5 separate cash deposits totaling $9,037; |
| April 28, 2008: | 2 separate cash deposits totaling $9,430; |
| April 29, 2008: | 3 separate cash deposits totaling $9,860; |
| April 30, 2008: | 1 cash deposit of $5,700; |
| December 3, 2008: | 3 separate cash deposits totaling $9,896; |
| December 4, 2008: | 5 separate cash deposits totaling $9,557; and |
| January 14, 2009: | 2 separate cash deposits totaling $9,899 |

Petitioner's expert, Frederick Bennett, created a report arguing that these cited examples

were multiple deposits made at the same bank at the same time, rather than deposits made the same day at different bank branches. (Pet. Mem. Ex. B at 6-8; 23-55.) Petitioner, however, has failed to address the remaining deposits in Byrd's structuring worksheet. Petitioner made additional deposits in 2008 on January 7 and 30; February 13, 21, 25; March 12, 25 and 27; April 9, 16 and 25; May 14 and 25; June 9, 12 and 24; August 8, 27 and 29; September 2, 11, 16, 24, 25, 26; October 1, 17, 20, 31; November 10; December 9 and 18. Petitioner has failed to show he did not make multiple deposits on the same day at different bank branches as stated in the PSR. Further, to the extent Petitioner may be claiming that Byrd stated Petitioner made every structured deposit at different bank branches on the same day, Petitioner has cited no evidence for this. In fact, some of the structured deposits consisted of a single cash deposit on certain days. These single structured deposits clearly could not have been made at multiple branches. Byrd also admitted at sentencing that Petitioner may have not made multiple trips to the bank on the same day, but may have submitted multiple deposit slips during one transaction at the bank. (Sent. Tr. at 36-37.) Petitioner's claim is without merit.

### D.     Deposits between $8,000-$9,900

Petitioner claims defense counsel was ineffective for failing to show that:

> Contrary to Byrd's testimony that "[m]ost of" Luck's deposits were between $8,000 and $9,900, only 6.5% of Luck's JP Morgan Chase bank account (WaMu) deposits for 2008 were within that monetary range, and, in fact, only 9.4% of those deposits identified by Byrd as evincing structuring were within that range.

(Pet. Mem at 8; Pet. Reply at 3.)

The record shows Byrd explained how he calculated the amount of structuring. He stated:

> What I did when I created the spreadsheet is, I put the customer deposit and backed out any checks or any miscellaneous items that were not cash that were deposited that day and I input them in the spreadsheet.
>
> Most of the deposits, give an example for January 14, 2008, he went to the bank four different times on that day and deposited $9,393. Most of the deposits, if you look at them, are in between 8 - and $9,900 that he deposited all in cash.

(Sent. Tr. at 32).

The January 14, 2008, deposits that Byrd referenced were four deposits for (1) $908; (2) $1,253; (3) $1,435; and (4) $5,800. These four deposits added up to $9,396. Likewise, the spreadsheet shows structuring on 48 dates from January 7, 2008 to February 26, 2009. On each of those 48 dates, the amount of cash deposits equaled $8,000 to $9,956.00 for the day. In other words, 100 percent of the cash deposits on these dates added up to $8,000 to $9,956 for the day.

Petitioner's expert, Frederick Bennett, claims that of the 139 individual deposits in the structuring spreadsheet, only 9.4% were between $8,000 to $9,900. (Pet. Mem. Ex. B at 8). Bennett, however, is citing each individual deposit for the day, rather than the total cash deposit for the day. (*Id.* at 56-62.) As Byrd's testimony makes clear, Byrd added the total cash deposits for the day. For January 14, 2008, he added the four cash deposits for that day and found they equaled $9,396. Likewise, the total cash deposits for each day in the structuring spreadsheet were between $8,000 and $9,956.

As for Petitioner's second claim that "only 6.5% of Luck's JPMorgan Chase bank account (WaMu) deposits for 2008 were within" $8,000 to $9,900, Petitioner has failed to submit any evidence on this issue, and Frederick Bennett's expert report does not address this issue. In any event, Byrd did not testify regarding all deposits to Petitioner's JPMorgan Chase bank account in 2008. Instead, as discussed above, Byrd testified that most of the structured cash

deposits from January 7, 2008 to February 26, 2009, were between $8,000 to $9,900 for each day. Petitioner's claim is without merit.

## 2. False Testimony

Petitioner claims "[t]he presentation of Byrd's testimony violated Luck's right to due process" because Byrd's testimony was false and material and the Government knew or should have know that Byrd's testimony was false. (Pet. Mem. at 10-13.)

The Government argues this claim is procedurally barred because Petitioner failed to raise the claim on direct appeal. When a defendant fails to raise a claim on direct appeal, the claim is procedurally defaulted, and can only be considered under § 2255 if the petitioner can show cause for his failure to raise the claim on direct appeal, and actual prejudice, or that he is actually innocent. *Bousley v. United States*, 523 U.S. 614, 622 (1998); *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996); *United States v. Acklen*, 47 F.3d 739, 741-42 (5th Cir. 1995). A petitioner may show cause for a procedural default by establishing that the factual or legal basis for the claim was not reasonably available to counsel at the time of direct review. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004).

Petitioner claims Frederick Bennett's report identifying alleged inaccuracies in Byrd's testimony was not available until after direct appeal. He also states his underlying bank records were not introduced into evidence at sentencing, so he could not raise this claim on direct appeal. (Pet. Reply at 10-11.) The factual basis for Petitioner's claim, however – that Byrd's testimony was false and material – was reasonably available to Petitioner at the time he filed his direct appeal. Petitioner admits his bank records were available at the time of sentencing. (Pet. Reply at 10.) Petitioner does not claim there was a legal basis for his claim that was not reasonably

available at the time of direct review. He also does not allege he is factually innocent of failure to file an IRS Form 8300. Petitioner's claim is therefore procedurally barred.

In the alternative, Petitioner's claim is without merit. As discussed above, Petitioner has failed to establish that Byrd's testimony was false. He has therefore failed to establish a violation of his due process rights.

### 3.  Recommendation

For the foregoing reasons, the Court recommends that the motion to correct, vacate or set-aside sentence pursuant to 28 U.S.C. § 2255 be denied.

Signed this 28 day of May, 2015.

PAUL D. STICKNEY  
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).